# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

REFUGIO RUBEN CARDENAS,
Defendant and Appellant.

S151493

Tulare County Superior Court
VCF117251

September 4, 2025

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

PEOPLE v. CARDENAS

S151493

Opinion of the Court by Kruger, J.

A jury convicted defendant Refugio Ruben Cardenas of the first degree murder of Gerardo Cortez and the attempted murders of Jorge Montez and Quirino Rosales. (Pen. Code, §§ 187, subd. (a), 664.) The jury found true a special circumstance allegation that Cardenas was an active participant in a criminal street gang and intentionally killed Gerardo Cortez in order to further the activities of the gang. (*Id.*, § 190.2, subd. (a)(22).) The jury also found true a number of sentence enhancement allegations, including allegations that Cardenas committed all three crimes for the benefit of, at the direction of, or in association with a criminal street gang. (*Id.*, § 186.22, subd. (b)(1)(C), (4).) The jury returned a verdict of death, and the trial court entered judgment accordingly. This appeal is automatic. (*Id.*, § 1239, subd. (b).)

We find error in the gang-related findings based on two legal developments that occurred after trial: This court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and the recent amendments to Penal Code section 186.22 made by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699; Assembly Bill 333). The error requires us to reverse the gang enhancements, the gang-murder special circumstance, and the death judgment. We further conclude that a limited remand is appropriate to permit Cardenas to develop his claim that his trial counsel violated his Sixth Amendment right of autonomy over the defense in violation of *McCoy v. Louisiana* (2018) 584

1

U.S. 414 (*McCoy*). We reverse the judgment and remand to the trial court for further proceedings in accordance with this opinion.

## I.  FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution Case*

The prosecution presented evidence to show that Cardenas was a member of the North Side Visalia gang who shot perceived rival gang members.

Cardenas spent the evening of October 9, 2003, with several friends, including Luis Rebolledo and Maricela Hernandez, at Hernandez's grandmother's home in Visalia. Rebolledo, Cardenas, and Gloria Carrasco, among others, walked to a nearby carport where Cardenas noticed a group of men at the end of the street and repeatedly asked if these men were "Scraps" — a derogatory term for Southerner gang members. This group of men included Octavio Cortez, Gerardo Cortez, Jorge Montez, and Quirino Rosales. Carrasco recognized Octavio and Gerardo as her cousins and tried to persuade Cardenas that the men were not Southerners.[1] Cardenas retorted that the men were "Scraps" because he saw one of them — Octavio — wearing blue, a color associated with Southerners; he also recognized Octavio and Gerardo as Southerner gang members, though Carrasco tried to convince Cardenas he was mistaken as to the men's identities.

Shortly after, Cardenas left the area on his bike. He returned about five minutes later carrying a shotgun. Carrasco

---

[1]  To avoid confusion, we refer to Octavio Cortez and Gerardo Cortez by their first names. No disrespect is intended.

saw Cardenas approaching the group of men at the end of the street and screamed, "Ruben . . . , no, those are my cousins." Cardenas walked up to the men and placed his hand on the trunk of Gerardo's car that was parked next to the men; subsequent examination of the vehicle showed the letters "D," "R," and "X," as well as the number "4," had been etched on the trunk. The prosecution presented evidence that "DR" referred to Cardenas's nickname, "Dirty Ruben," and "X4" represented a North Side Visalia gang symbol.

Cardenas shot Montez in the chest. He fired into the rear window of the parked car, striking Gerardo in the head. Rosales tried to run away and fell to the ground; Cardenas aimed at him and shot, but missed. After firing these three shots, Cardenas ran off. Gerardo was pronounced dead when emergency medical responders arrived; Montez was hospitalized and ultimately survived.

Following the shooting, Cardenas left Visalia to stay with his stepsister, Evelyn Garza, in Sacramento. When Garza learned that Cardenas was wanted for murder and asked him to leave her home, Cardenas pointed a gun at her face. David Cervantes, who then picked up Cardenas from Garza's home, testified that Cardenas placed a shotgun in his trunk and stated he was wanted for murder because he shot somebody. Cardenas later returned to Visalia, where Police Officer Mark Lopez recognized and, after a brief struggle, apprehended Cardenas on November 26, 2003. Lopez found a sawed-off shotgun underneath Cardenas's clothing that a firearms examiner testified matched the shotgun shells recovered at the crime scene. After his arrest, Cardenas asked Lopez why he was being charged with three counts of attempted murder and one count of murder when he "only shot two people."

3

Trial began in January 2007. At trial, Visalia Police Officer Luma Fahoum testified as the prosecution's gang expert. Fahoum opined that Cardenas was a member of the North Side Visalia (NSV) gang, a gang of Norteños, or Northerners, located in Visalia. She based her opinion on police reports and field interview cards indicating Cardenas spent time with other NSV members and participated in assaults against perceived members of the rival Sureños, or Southerners, Cardenas's red clothing and accessories (a color associated with the NSV gang), and conversations with "reliable sources" such as "people from the neighborhood, people who are victims, witnesses, other Northerners." More generally, Fahoum testified as to how she identifies gang members, the background and makeup of local gangs, elements of Norteño, NSV, and Sureño gang culture including symbolic colors and tattoos, and NSV's gang activities. The prosecution also introduced evidence that when Cardenas and Rebolledo were together on the evening of the shooting, Rebolledo confronted a boy wearing a blue jersey, stating they were in NSV gang territory. As evidence that NSV constituted a criminal street gang under the law, Fahoum testified about two prior offenses alleged to have been committed by NSV members: First, a drive-by shooting on July 14, 2001, perpetrated by Hector Mendoza; and second, an assault by Cardenas against Jose Pena, whom Cardenas perceived to be a Southerner gang member, on November 9, 2000, which led to Cardenas's institutionalization at the California Youth Authority between 2001 and 2003.

The prosecution also presented evidence that the word "Sur" and the number "13" — both references to the Sureño gang — were written in blue ink near the driver's side of Gerardo's vehicle, which Fahoum considered to be evidence that

Gerardo and Octavio were "validated" Sureño members. Discussing a hypothetical involving similar signs of gang affiliation by the victims and the shooter's references to the victims as "Scraps," Fahoum asserted that the shooting would be unlikely to concern a personal dispute but would instead be a gang-motivated incident.

### 2. *Defense Case*

The defense's primary argument was that Cardenas had not shot Gerardo with premeditation or deliberation and that the jury should thus not find him guilty of first degree murder. Defense counsel also argued that Cardenas had renounced his gang membership while at the California Youth Authority and committed the shooting due to a preexisting personal dispute with Gerardo, rather than in connection with a criminal street gang as required for the gang-murder special circumstance.[2] Several years before the shooting, Gerardo and Cardenas had an altercation during which Gerardo attacked Cardenas with a screwdriver while a group of other individuals attempted to restrain Cardenas. At the end of the fight, Cardenas gained possession of the screwdriver. Following the charged shooting, Gerardo's autopsy revealed a screwdriver wrapped into the back of his shirt; another screwdriver was found on the backseat floorboard of his car.

---

[2] Defense counsel further argued that the circumstances of the shooting showed that Cardenas did not have the intent to kill but only intended to get the victims "scared away." She asserted that Montez and Rosales were moving toward Cardenas when he shot them to make them "run away instead of coming at him," and that Cardenas could not see clearly through the dark car window between him and Gerardo and shot at the window to scare Gerardo.

The defense presented its own gang expert, Steven Strong, a private investigator and former Los Angeles Police Department officer, who testified based on a hypothetical that the facts of the shooting more likely reflected a "personal matter rather than a gang matter." Strong disputed that identifying as a Southerner or wearing certain colors or tattoos necessarily indicates street gang membership in Visalia rather than merely geographic identification.

With regard to the etchings on Gerardo's trunk that the prosecution asserted represented gang symbols, a defense handwriting expert could neither identify nor rule out Cardenas as responsible for the etchings but was doubtful that the etchings read "D," "R," "X," and "4." The defense also argued that the letters "D" and "R" did not represent Cardenas's nickname but were instead the initials of a different individual who was also present at the scene of the shooting. Several witnesses, including Cardenas's teachers and supervisors at the California Youth Authority, testified that Cardenas did not write gang signs or get into gang-related fights, but instead officially denounced his gang affiliation while institutionalized.

### 3. *Jury Verdict*

The jury found Cardenas guilty of the first degree murder of Gerardo and the attempted murders of Montez and Rosales. (Pen. Code, §§ 187, subd. (a), 664.) The jury also found true the special circumstance allegation that Cardenas intentionally killed Gerardo while Cardenas was an active participant in a criminal street gang, and the murder was carried out to further the activities of the criminal street gang. (*Id.*, § 190.2, subd. (a)(22).) The jury found true sentence enhancement allegations that Cardenas had committed all three crimes for the benefit of,

6

at the direction of, or in association with a criminal street gang. (*Id.*, § 186.22, subd. (b)(1)(C), (4).) Finally, the jury also found true allegations that Cardenas personally and intentionally discharged a firearm causing great bodily injury with respect to the murder of Gerardo and the attempted murder of Montez, but it did not find true the same with respect to the attempted murder of Rosales. (*Id.*, § 12022.53, subd. (d).)

## B. Penalty Phase

### 1. *Prosecution Case*

The prosecution introduced as evidence in aggravation that while in a holding cell on May 3, 2004, Cardenas made a remark about Southerners and then struck a fellow inmate with his handcuffs. The prosecution also presented victim impact testimony from Montez and Rosales, as well as family members of all three victims.

### 2. *Defense Case*

Several family members and friends testified to the difficult circumstances of Cardenas's childhood. Cardenas's biological father was often incarcerated. His mother used drugs, got into physical confrontations around her children, and also moved in and out of incarceration. Cardenas and his siblings were often absent from school, had lice, and were at times placed in foster care. Authorities who learned about Cardenas's living conditions recommended him for a number of social services. The defense also presented evidence that Cardenas may have had a learning disability and that he had been diagnosed as a socially and emotionally disturbed child. A cognitive development expert opined that Cardenas's family risk factors, learning disability, and young age (Cardenas was 19 years old

at the time of the crime) drew him to negative influences like gangs.

### 3. *Jury Verdict and Sentence*

Following the hearing of evidence in the penalty phase, the jury returned a verdict of death. The court denied the automatic motion to modify the death verdict and sentenced Cardenas to death. The court also imposed consecutive indeterminate terms of life with the possibility of parole, plus a firearm enhancement of 25 years to life with a gang enhancement minimum parole eligibility period of 15 years, for the attempted murder of Montez, and 15 years to life, with a gang enhancement minimum parole eligibility period of 15 years, for the attempted murder of Rosales.

## II. PRETRIAL ISSUES

### Motion To Recuse the District Attorney's Office

Before trial, Cardenas's appointed counsel left the Tulare County Public Defender's Office to join the Tulare County District Attorney's Office as a senior deputy district attorney. Cardenas then moved to recuse the entire Tulare County District Attorney's Office. Cardenas contends the trial court committed reversible error by denying the motion without first holding an evidentiary hearing. The claim lacks merit.

### 1. *Background*

Arthur Hampar was appointed as Cardenas's counsel in December 2003 and acted as Cardenas's attorney until August 2005, when Hampar left the Tulare County Public Defender's Office to join the Tulare County District Attorney's Office as a senior deputy district attorney. In May 2006, Cardenas moved to recuse the entire Tulare County District Attorney's Office under Penal Code section 1424, alleging that Hampar would

bring to the district attorney's office substantial knowledge of the defense strategy after nearly two years of representation. Cardenas posited that Hampar's conflict should be imputed to the rest of the district attorney's office because Hampar was entering the office as a "Level V" attorney. Relying on a job description, Cardenas alleged that this meant Hampar would have supervisory duties over lower-level attorneys in the unit handling his case.

Both the Tulare County District Attorney and the Attorney General filed motions in opposition, with the former accompanied by the declaration of Shani Engum, the prosecutor assigned to Cardenas's case and the supervisor of the unit Hampar had joined. Both oppositions conceded that there was a conflict of interest as to Hampar but contended that this conflict did not warrant recusal of the entire district attorney's office. Engum stated in her declaration that Hampar had not spoken to her or anyone else in the district attorney's office about Cardenas's case. Engum also declared that Hampar did not have access to the prosecution files in the matter and did not supervise anyone in the district attorney's office. At the hearing on the recusal motion, Engum reiterated to the court that "Hampar [] had no contact with [Cardenas's] file."

The trial court denied Cardenas's motion to recuse the entire district attorney's office, finding "no conflict that [the court could] see based upon the facts in the affidavit filed by Ms. Engum."

### 2. *Discussion*

Under Penal Code section 1424 (section 1424), a motion to recuse a prosecutor "may not be granted unless the evidence shows that a conflict of interest exists that would render it

9

unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1) (section 1424(a)(1)).) The statute sets out a two-part test: (1) the court first determines whether there is a conflict of interest; and (2) it then considers whether the conflict is " ' " 'so severe as to disqualify the district attorney from acting.' " ' " (*People v. Trinh* (2014) 59 Cal.4th 216, 229 (*Trinh*), quoting *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).) Under the first part of this test, "a court must determine whether a conflict exists, that is, whether 'the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' [Citations.] If such a conflict exists, the court must further determine whether the conflict is ' " 'so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings.' " ' " (*Haraguchi*, at p. 713.) The defendant " 'bear[s] the burden of demonstrating a genuine conflict.' " (*Trinh*, at p. 229.) "That burden is especially heavy where, as here, the defendant seeks to recuse not a single prosecutor but the entire office." (*Ibid.*, citing *People v. Gamache* (2010) 48 Cal.4th 347, 361 (*Gamache*).)

To seek disqualification under section 1424, the defendant must file a notice of motion containing a "statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon by the moving party and shall be supported by affidavits of witnesses who are competent to testify to the facts set forth in the affidavit." (§ 1424(a)(1).) The district attorney and Attorney General may then file affidavits in opposition to the motion. (*Packer v. Superior Court* (2014) 60 Cal.4th 695, 710.) "An evidentiary hearing may be ordered if the defendant's affidavits establish a prima facie case for recusal — that is, if the defendant's affidavits, if *credited*, would

require recusal." (*Ibid.*) The decision whether to grant an evidentiary hearing is reviewed for abuse of discretion, as is the decision whether to grant or deny the motion. (*Ibid.*; see *Haraguchi, supra,* 43 Cal.4th at pp. 711–712; see also *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728 [the same standard applies in capital cases].) Under this standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi*, at pp. 711–712, fns. omitted.)

Cardenas contends that the trial court abused its discretion when it denied his motion to recuse the entire Tulare County District Attorney's Office based on its employment of his former defense attorney without first holding an evidentiary hearing. We disagree. The trial court concluded that Hampar's employment did not warrant the severe remedy of recusing the entire district attorney's office, based on evidence that the district attorney's office had effectively screened Hampar off from the case. The trial court did not abuse its discretion in so concluding. (See, e.g., *Gamache, supra,* 48 Cal.4th at p. 365 [recusal of entire district attorney's office was not warranted where, inter alia, conflicted employee had been screened off from the case].)

The core of Cardenas's recusal motion was based on an assertion that any ethical wall implemented by the district attorney's office would inevitably be compromised by what he understood to be Hampar's supervisory position in the office. But the declarations and additional information supplied by the district attorney and the Attorney General effectively responded to those concerns: Although the job description for Hampar's position mentioned the possibility of supervision, Engum's

affidavit made clear that Hampar did not in fact supervise line attorneys and that it was Engum who actually supervised Hampar's unit. Engum further made clear that Hampar had not touched the office's Cardenas file, that no one working on the case had spoken to him about it, and that she would not speak to him about the case in the future.

In his briefing in this court, Cardenas does not dispute that it was theoretically possible for the district attorney's office to implement an effective ethical wall capable of "sanitizing" Hampar's conflict of interest; he argues, however, that the evidence was insufficient to show that Hampar had actually been walled off from his case. Cardenas makes much of the fact that the record contains no declaration from Hampar himself, or from "higher staff" in the office, who might have promised to "supervise the situation and ensure that an 'ethical wall' was in effect." He also notes that while Engum said that she would not speak to Hampar about the case, she "did not pledge to refuse help if Hampar offered it." But in the trial court, Cardenas did not ask for representations from Hampar himself or from "higher staff"; although the district attorney's office offered to provide such representations, Cardenas instead asked that the court rule on the recusal motion with the materials that were then available to it. And while additional evidence — particularly from Hampar himself — would have been helpful to the inquiry, the trial court did not err in relying on Engum's representations about the nature of the ethical wall, given Engum's role as Hampar's supervisor and as the prosecutor trying Cardenas's case. The trial court was, moreover, entitled to consider these representations in light of the ethical rules imposing continuing duties on Hampar with respect to his former client Cardenas, breach of which could have subjected

12

Hampar to professional discipline. (See Rules Prof. Conduct, rule 1.9.) Cardenas has identified nothing in the record to suggest that the ethical wall was not, in fact, effective. (Compare *Gamache*, *supra*, 48 Cal.4th at p. 365 ["[N]o evidence was advanced that would suggest such screens had not been or could not be effective"] with *People v. Choi* (2000) 80 Cal.App.4th 476, 483 [finding the ethical wall ineffective based on evidence that the conflicted district attorney had ex parte contact with the court about the case and spoke to others within his office about the case].)

Cardenas argues, finally, that even if the trial court reasonably declined to order that the entire district attorney's office be recused, the trial court should have at least entered an order requiring Hampar to recuse himself. But, as noted, the evidence indicates that Hampar had already recused himself, and Cardenas never asked the trial court to enter an order directing the same. Cardenas suggests that the trial court should nonetheless have entered a recusal order on its own motion. Cardenas relies on the Court of Appeal's adoption of a similar approach in order to "help avoid the appearance of impropriety" stemming from a potential conflict in *Love v. Superior Court*, a case predating the enactment of section 1424. (*Love v. Superior Court* (1980) 111 Cal.App.3d 367, 374; see *id.* at p. 375.) But our cases make clear that recusal under section 1424 is appropriate only if the defendant can show a "real, not merely apparent," potential for prejudice that rises to "the level of a *likelihood* of unfairness." (*People v. Eubanks* (1996) 14 Cal.4th 580, 592.) Here, the trial court reasonably concluded that the ethical wall constructed by the district attorney's office was sufficient to mitigate the potential for prejudice. Ultimately, "[b]ecause defendant failed to show an actual

*likelihood* that he would receive unfair treatment as a result of [Hampar's] employment [citation], the court properly denied the recusal motion." (*People v. Bell* (2019) 7 Cal.5th 70, 98.)

Having found no violation under the " 'prophylactic' " recusal rule set forth in section 1424, we likewise find no violation of Cardenas's due process rights. (*Trinh*, *supra*, 59 Cal.4th at p. 231; *Gamache*, *supra*, 48 Cal.4th at p. 366 ["If recusal was properly denied under section 1424, ipso facto no due process violation occurred"].)

## III. GUILT PHASE ISSUES

### A. Gang Allegations

Cardenas contends that all the gang findings in this case, including both the gang enhancements and the gang-murder special circumstance, must be reversed because of two significant legal developments postdating the trial: this court's decision in *Sanchez*, *supra*, 63 Cal.4th 665, which set forth evidentiary limits on the use of out-of-court statements to prove gang allegations; and the passage of Assembly Bill 333, which amended the definition of criminal street gang activity. The Attorney General agrees that, under current law, the evidence presented at trial is insufficient to establish that members of the NSV gang were engaged in a " 'pattern of criminal gang activity.' " (Pen. Code, § 186.22, subd. (e)(1) (section 186.22(e)(1)).) We agree as well. We must therefore reverse the gang enhancements and the gang-murder special circumstance. Because the gang-murder special circumstance was the only special circumstance alleged and found true by the jury, reversal of the special circumstance also requires us to reverse the judgment of death.

### 1. *Background*

The California Street Terrorism Enforcement and Prevention Act (STEP Act; Pen. Code, § 186.20 et seq.), first enacted in 1988, created a sentencing enhancement for felonies committed "for the benefit of, at the direction of, or in association with a criminal street gang." (Pen. Code, § 186.22, subd. (b)(1) (section 186.22(b)(1)).) The STEP Act defined such a criminal street gang in Penal Code section 186.22, subdivision (f) as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated offenses], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (*Id.*, § 186.22, former subd. (f).) The prosecution must establish this " 'pattern of criminal gang activity' " by showing "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more [enumerated] offenses," also referred to as predicate offenses, under certain conditions. (§ 186.22(e)(1).)

The electorate later incorporated this definition of a "criminal street gang" set forth in Penal Code section 186.22, subdivision (f) when it added the gang-murder special circumstance to Penal Code section 190.2 through Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998 (as approved by voters, Primary Elec. (Mar. 7, 2000)). If it is found that the "defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang," the penalty for murder in the first degree is death

or imprisonment for life without parole. (Pen. Code, § 190.2, subd. (a)(22) (section 190.2(a)(22)).) As noted, under Penal Code section 186.22, subdivision (f)'s definition of " 'criminal street gang,' " the prosecution must prove a " 'pattern of criminal gang activity' " as defined in section 186.22(e)(1).

In this case, as noted, the jury found true multiple gang allegations under these provisions. The jury found true enhancement allegations that Cardenas committed the murder of Gerardo Cortez and the attempted murders of Jorge Montez and Quirino Rosales "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" within the meaning of section 186.22(b)(1). The jury also found true the special circumstance allegation that the first degree murder of Gerardo was committed by an "active participant in a criminal street gang . . . to further the activities of the . . . gang." (§ 190.2(a)(22).)

To prove these allegations, the prosecution had introduced the testimony of a gang expert, Visalia Police Officer Luma Fahoum. Among other things, Fahoum offered testimony to establish that NSV, the gang that the prosecution argued Cardenas belonged to, constituted a criminal street gang within the meaning of Penal Code section 186.22. To establish the necessary predicate offenses, Fahoum testified about two prior offenses committed by NSV members: First, a drive-by shooting in July 2001, perpetrated by another NSV member, Hector Mendoza, and second, a November 2000 assault by Cardenas against a perceived Southerner gang member.

Two relevant legal developments occurred after the trial in this case. The first involves the use of hearsay evidence to

prove gang allegations. At the time of the trial, the law of this court permitted a qualified expert witness to testify on direct examination to any sufficiently reliable hearsay sources the experts used in formulating their opinions, on the theory that such hearsay was not being admitted for its truth. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618; *People v. Montiel* (1993) 5 Cal.4th 877, 919.) Years later, in *Sanchez, supra,* 63 Cal.4th 665, this court reevaluated that approach. *Sanchez* held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Id.* at p. 686.) Under state evidence law, such case-specific out-of-court statements are therefore inadmissible "unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Ibid.*) In addition, if the case is one in which a prosecution expert seeks to relate hearsay that is "testimonial," as that term has been understood in the context of the confrontation clause of the Sixth Amendment to the United States Constitution, the admission of such hearsay violates this constitutional protection "unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez,* at p. 686.)

In *Sanchez,* the court held that a prosecution gang expert's testimony violated these rules insofar as they contained case-specific facts derived from out-of-court sources to prove that the defendant committed the crimes with which he had been charged with intent to benefit his gang. (*Sanchez, supra,* 63 Cal.4th at pp. 698–699.) Later, in *People v. Valencia* (2021) 11

Cal.5th 818 (*Valencia*), we specifically considered how these rules apply to facts used to establish that a gang's members have engaged in "a pattern of criminal gang activity" (Pen. Code, § 186.22, subd. (f)), a term defined in part to mean the commission of two or more enumerated offenses (*id.*, § 186.22, former subd. (e)). We held that, under *Sanchez*, the commission of these so-called predicate offenses, too, must be proven by independently admissible evidence and "may not be established solely by the testimony of an expert who has no personal knowledge of facts otherwise necessary to satisfy the prosecution's burden." (*Valencia*, at p. 826; see *id.* at p. 839.)

The other relevant development involved legislative changes to the STEP Act. After Cardenas's trial, the Legislature amended the STEP Act through Assembly Bill 333, which became effective on January 1, 2022. Assembly Bill 333 made several changes to the law on active gang participation and gang enhancements. "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' ([Pen. Code, ]§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as

opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  ([Pen. Code, ]§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)  These changes apply retroactively to cases that were not yet final as of Assembly Bill 333's effective date.  (*Tran*, at pp. 1206–1207.)

Assembly Bill 333 also added Penal Code section 1109, "which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense."  (*Tran*, *supra*, 13 Cal.5th at p. 1206.)  This bifurcation provision, unlike the changes narrowing the substantive reach of the definition of a criminal street gang, does not apply retroactively.  (*People v. Burgos* (2024) 16 Cal.5th 1, 8.)

### 2.  *Discussion*

In order to establish both the gang enhancements and the gang-murder special circumstance, the prosecution was required to establish a " 'pattern of criminal gang activity' " by NSV through sufficient proof of at least two gang-motivated predicate offenses committed by gang members. (§ 186.22(e)(1).)  Both sides agree that as a result of *Sanchez* and the legislative changes made by Assembly Bill 333, there is

insufficient evidence in the record to fulfill this statutory requirement. We agree as well.

The prosecution offered proof of three predicate offenses committed by NSV members: (1) a drive-by shooting on July 14, 2001, by Hector Mendoza; (2) a prior assault committed by Cardenas on November 9, 2000, against a perceived rival gang member; and (3) the shooting charged in this case.[3] Assembly Bill 333 provides, however, that the "currently charged offense shall not be used to establish the pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (e)(2); *Tran*, *supra*, 13 Cal.5th at p. 1206.) This change, which applies retroactively (*Tran*, at pp. 1206–1207), precludes reliance on the charged shooting to establish the required pattern of criminal gang activity.

The parties also agree that the rule of *Sanchez* precludes reliance on at least one of the other predicate offenses to satisfy the statutory requirement. To establish the predicate offense involving Hector Mendoza, Officer Fahoum related to the jury information she obtained from conversations with the detective who worked on that case and police reports from the case. These conversations and reports indicated that Mendoza "self-admi[tted] that he was a North Side gang member" and that he "threw down a red bandanna [*sic*] on the pavement" at the crime scene on Paradise and Demaree Streets, in Visalia. Fahoum opined that the particular type of offense — a drive-by

---

[3] Although Officer Fahoum testified to other offenses meant to evidence the primary activities of NSV or Cardenas's gang membership, the prosecution did not offer them as predicate offenses at trial, and the Attorney General expressly disclaims reliance on them.

shooting — was among NSV's typically "gang-related" activities and that Mendoza throwing down a red bandana "signif[ied] this was an assault done by the north." On that basis, she concluded that Mendoza was an NSV member at the time of the offense.

In so testifying, Officer Fahoum did not merely rely on hearsay in forming her opinions; she related inadmissible case-specific hearsay to the jury in violation of *Sanchez*. (*Sanchez*, *supra*, 63 Cal.4th at pp. 685–686.) The evidence the prosecution did present violated state evidence law. And further, because the hearsay on which Officer Fahoum relied was testimonial in nature — consisting of police conversations and reports compiled for the primary purpose of investigating the crime Mendoza committed — the information was also admitted in violation of Cardenas's constitutional confrontation rights. (*Id.* at pp. 689, 694.)

The parties also agree that this *Sanchez* violation was not harmless. Absent the impermissible hearsay, there is insufficient evidence to support the necessary findings about the Mendoza incident. (See *Valencia*, *supra*, 11 Cal.5th at p. 829.) And without sufficient evidence to support one of the only two predicate offenses that could potentially remain valid after Assembly Bill 333, there is insufficient evidence to fulfill the law's requirement that the prosecution show a pattern of criminal gang activity under section 186.22(e)(1).

In sum, based on *Sanchez* and Assembly Bill 333, we must reverse the gang enhancements. And because application of the gang-murder special circumstance, too, depends on adequate proof of a pattern of gang activity under section 186.22(e)(1), we must also reverse the special circumstance finding. (*People v. Rojas* (2023) 15 Cal.5th 561, 565–566 [Assem. Bill 333's

amendments to § 186.22 apply to the gang-murder special circumstance].) And finally, because the gang-murder special circumstance was the only special circumstance alleged in the case, the reversal of the special circumstance finding requires us also to reverse the judgment of death.[4]

## B. Denial of Motion To Bifurcate Gang Allegations

Cardenas asserts that the trial court erred in denying his motion to bifurcate the gang allegations from the substantive offenses. As noted, Assembly Bill 333 contains a provision requiring bifurcation at the defendant's request. But this provision does not apply retroactively to cases tried before Assembly Bill 333's effective date, as Cardenas's was. (*People v. Burgos*, *supra*, 16 Cal.5th at p. 8.) Even before Assembly Bill 333, trial courts had the discretion to bifurcate gang allegations to avoid undue prejudice. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 (*Hernandez*).) Cardenas argues that the trial court abused that discretion in denying bifurcation here, and in so doing deprived him of his due process right to a fair trial.

We are unpersuaded by the argument. In *Hernandez*, we instructed that a key factor for courts to consider in deciding

---

[4] Cardenas requests that we take judicial notice of the fact that the gang-murder special circumstance was found true in the 44 cases listed in the appendix to his supplemental opening brief. We deny Cardenas's request for judicial notice. Cardenas submitted this request to support his claim that the gang-murder special circumstance is unconstitutional because it is disproportionately imposed on African American and Latino defendants. Because we conclude that the gang-murder special circumstance must be reversed in light of *Sanchez*, *supra*, 63 Cal.4th 665 and Assembly Bill 333, we do not reach this constitutional issue.

whether to bifurcate the trial of gang allegations is whether the evidence used to prove the allegations would have been admissible in any event at a trial on the underlying charges. (*Hernandez, supra,* 33 Cal.4th at pp. 1049–1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled"].) Here, much of the gang-related evidence would have been admissible to show Cardenas's motive for and intent in committing the charged offenses, the murder and attempted murders of persons he perceived to be members of a rival gang.

Cardenas does not seriously dispute the point, but argues that the gang-related evidence admitted was more extensive than necessary for that purpose and included evidence that would not have been admissible to prove the charged offenses, including evidence of an unrelated predicate offense committed by a different NSV member. Cardenas also argues that the trial court should have granted bifurcation to avoid the prejudicial effect of evidence of uncharged crimes Cardenas had committed as a juvenile, including his 2000 assault of perceived rival gang member Jose Pena, which the prosecution used to establish a pattern of criminal gang activity, and his 2000 assault of Rolando Viera, another perceived rival gang member. Cardenas acknowledges that these incidents might have been admissible to prove his motive and intent in this alleged gang-related shooting, but emphasizes that the trial court would have had to engage in an " 'extremely careful analysis' " before admitting uncharged prior crimes solely for that purpose. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)

Cardenas has not met his burden to show unfairness in the denial of bifurcation. The evidence concerning NSV, including the evidence of its members' criminal activities, "was

not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of [Cardenas's] actual guilt." (*Hernandez, supra,* 33 Cal.4th at p. 1051; see *ibid.* [it is the defendant's burden " 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried' "].) Cardenas's uncharged gang-related crimes were not particularly "inflammatory in comparison" to the charged offenses; the prior incidents involved attacks with a fist or blunt object, and neither of the victims claimed long-term physical injury. The charged offenses, by contrast, involved a firearm, long-term injuries, and death. And contrary to Cardenas's contention, the trial court appropriately limited the jury's consideration of crimes committed by other gang members as evidence of a " 'pattern of criminal gang activity,' " of his assault on Viera as evidence of motive and intent, and of his assault on Pena as evidence of a " 'pattern of criminal gang activity' " or motive and intent. (§ 186.22(e)(1).)

In short, the trial court did not abuse its discretion in declining to bifurcate the trial of the gang allegations in a case involving a gang-motivated shooting of rival gang members, nor did the trial court's decision render Cardenas's trial fundamentally unfair.

### C. Sufficiency of the Evidence Supporting Gang Findings Under the Law Applicable at the Time of Trial

Cardenas also argues that there was insufficient evidence to support the gang findings even under the law as it existed at the time of trial. Although we have already concluded that the gang findings must be reversed based on *Sanchez* and Assembly Bill 333, we address Cardenas's sufficiency of the evidence

claims to determine whether retrial of the gang allegations is permissible under the double jeopardy clause. (*People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [following reversal on insufficiency of the evidence grounds, " 'the Double Jeopardy Clause bars the prosecutor from making a second attempt at conviction' "]; see *People v. Hin* (2025) 17 Cal.5th 401, 454–455.) We conclude there was sufficient evidence under the law as it existed at the time of trial and thus perceive no double jeopardy bar to retrial of the gang allegations.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) This determination "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Even "[e]vidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission." (*People v. Navarro* (2021) 12 Cal.5th 285, 311 (*Navarro*).) The same standard applies to special circumstance findings. (*People v. Chatman* (2006) 38 Cal.4th 344, 389.)

At the time of trial, the gang enhancement applied to a person convicted of a statutorily enumerated felony, if that

person committed the felony: (1) "for the benefit of, at the direction of, or in association with any criminal street gang"; and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, former subd. (b)(1).)[5] As noted, Penal Code section 186.22, former subdivision (f) provided the definition of " 'criminal street gang,' " which, among other things, required proof that the gang had certain criminal acts as one of its "primary activities" and that gang members engaged in a "pattern of criminal gang activity."

The gang-murder special circumstance, for its part, contained three basic elements: (1) the "defendant intentionally killed the victim," (2) "while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of [Penal Code ]Section 186.22," and (3) "the murder was carried out to further the activities of the criminal street gang." (§ 190.2(a)(22); see *People v. Mejia* (2012) 211 Cal.App.4th 586, 612.) As courts have observed, the third element "substantially parallels the language of section 186.22, subdivision (b)(1)" that the defendant have a " 'specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Carr* (2010) 190 Cal.App.4th 475, 488 (*Carr*).)

In evaluating Cardenas's challenges to the sufficiency of the evidence, we first consider the evidence concerning elements common to the gang enhancement and gang-murder special

_____

[5] Section 186.22(b)(1) has since been amended to require the defendant to commit the felony: (1) "for the benefit of, at the direction of, or in association with *a* criminal street gang" (replacing "any" with "a"); and (2) "with the specific intent to promote, further, or assist in criminal conduct by gang members" (removing the word "any" before "criminal conduct"). (*Ibid.*, italics added.)

circumstance before turning to the evidence concerning other elements.

### 1. *Elements Common to the Gang Enhancement and Gang-Murder Special Circumstance*

#### a. *Primary Activities of the Gang*

To prove both the gang enhancements and the gang-murder special circumstance, the prosecution was required to show that NSV met the definition of " 'criminal street gang' " in effect at the time of trial, meaning, among other things, that the gang had "as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e)" of section 186.22. (Pen. Code, § 186.22, former subd. (f).) To support the jury's finding on this issue, the Attorney General points to Officer Fahoum's expert testimony, during which she enumerated NSV's primary activities as including "graffiti, grand theft auto, carjacking, assault with a deadly weapon, a drive-by shooting, murder, [and] attempted murder." In addition to relying on police reports, she indicated that she had personal knowledge of NSV members engaging in all of these activities. Fahoum also named particular NSV members and the crimes they committed. Based on her testimony, a rational trier of fact could conclude that NSV members "consistently and repeatedly have committed criminal activity listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324, italics omitted.)

#### b. *Pattern of Criminal Gang Activity*

To establish that NSV qualified as a "criminal street gang," the prosecution was also required to demonstrate that NSV members engaged in a " 'pattern of criminal gang activity,' " meaning that gang members had committed at least

two qualifying predicate offenses. (Pen. Code, § 186.22, former subd. (e).) As previously noted, the prosecution offered two predicate offenses other than the charged shooting: (1) a drive-by shooting committed by NSV member Hector Mendoza on July 14, 2001; and (2) an assault on a perceived rival gang member committed by Cardenas on November 9, 2000. There was substantial evidence to support jury findings on both of these predicate offenses under the law in effect at the time of trial.

### i. July 14, 2001, Shooting by Hector Mendoza

As discussed above, Officer Fahoum's opinion that Hector Mendoza was an NSV member at the time of his July 14, 2001, drive-by shooting was based on conversations with a detective and police reports that indicated that Mendoza "self-admi[tted] that he was a North Side gang member" and "threw down a red bandanna [*sic*] on the pavement" at the crime scene in Visalia, as well as on Fahoum's assessment that the crime was "gang-related." Cardenas challenges this evidence of Mendoza's NSV membership, noting that this testimony conveyed inadmissible case-specific hearsay and that the jury was instructed that the hearsay was not being offered for its truth.

Although Fahoum's testimony about Mendoza's NSV membership may have been improperly admitted, we nonetheless consider that evidence in determining whether the predicate offense was shown by sufficient evidence under the law as it existed at the time. (*Navarro*, *supra*, 12 Cal.5th at p. 311 [evidence erroneously admitted under *Sanchez* is properly considered in weighing the sufficiency of the evidence].) Based on this testimony that showed multiple indicia of gang membership, a rational trier of fact could conclude beyond a reasonable doubt that Mendoza was an NSV member.

### ii. *November 9, 2000, Assault on Jose Pena*

Cardenas asserts that there was insufficient evidence to prove that he was an NSV member when he assaulted Jose Pena on November 9, 2000. Cardenas argues, in particular, that the evidence of his NSV membership at the time of Pena's assault was insubstantial and based on hearsay. Again, although the evidence may have been erroneously admitted, we still consider it in evaluating the sufficiency of the evidence to support the jury verdicts. And the admitted evidence was substantial: Officer Fahoum relied on a wide range of evidence corroborated by other witnesses, much of which involved events before or around November 2000, and supported a finding that Cardenas was an NSV member at that time.

Officer Fahoum described 10 criteria that can be used to assess gang membership and asserted that three are necessary to "validate" a gang member.[6] She validated Cardenas as an active NSV member at the time of the 2003 shooting based on six criteria: "[1] [H]is habitual wearing of red clothing. [2] He has a gang-related tattoo. [3] Habitually involved in a gang-related crime using derogatory slurs towards opposing gang members. [4] He had a photo of known gang members or of perceived gang members in his room. [5] He associates with

---

[6] The 10 criteria were: (1) self-admission; (2) admission in a custodial facility; (3) being named by a reliable source, like probation, parents, or other gang members; (4) associating with known gang members; (5) being identified as corresponding with known gang members, for example, through jail mail; (6) gang-related tattoos; (7) gang-related clothing; (8) involvement in gang-related crimes; (9) being in photographs with known gang members; and (10) having or making gang writings, like graffiti or doodling.

known gang members, for example, Luis Rebolledo. [6] He has been named by several reliable sources, being people from the neighborhood, people who are victims, witnesses, other Northerners." In reaching these conclusions, Fahoum relied on multiple sources pertaining to events before or around November 2000: a photo album that Fahoum seized from Cardenas's residence following the charged offense, which contained photos of potential NSV members; police reports from July 1998 showing Cardenas violating curfew with NSV member Martin Fiero;[7] background research on Luis Rebolledo, who associated with Cardenas, showing that Rebolledo was an NSV member; police reports and witness statements describing an event in October 2000 during which Cardenas assaulted Rolando Viera, a perceived rival gang member, taking items from him that ended up in the home of NSV member Rebolledo; police reports and field interview cards from December 2000 about Cardenas sharing company with NSV member Gerardo Cortez;[8] and other "reliable sources," such as "people from the neighborhood, people who are victims, witnesses, other Northerners" naming Cardenas as an NSV member.

In addition, Rolando Viera testified that on October 11, 2000, Cardenas, accompanied by several other individuals, called him a "Scrap," threatened to "take off" his Sureño gang-

---

[7] The parties agree that Officer Fahoum's testimony as to Cardenas violating curfew with Martin Fiero in 1998 is inadmissible under the confrontation clause. As noted above, we still consider erroneously admitted evidence in weighing the sufficiency of evidence to support a conviction. (*Navarro, supra,* 12 Cal.5th at p. 311.)

[8] This individual is a different person from the deceased in this case.

related tattoo with a knife, hit him multiple times, and stole his pager and jacket. Cardenas's stepsister Evelyn Garza identified him as family and noted that "all [her] family is Norteños." Given the evidence, a reasonable fact finder could conclude that Cardenas was an NSV member at the time of his assault on Jose Pena.

Cardenas contends that this evidence falls short under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). In *Prunty*, we concluded that the prosecution failed to show that the predicate and charged offenses were attributable to a single " 'criminal street gang' " because the evidence was insufficient to establish an "associational or organizational connection between the two alleged Norteño subsets that committed the requisite predicate offenses, and the larger Norteño gang." (*Prunty*, at p. 81.) Cardenas contends that the same is true here, where the jury heard evidence about "Norteños" as well as NSV members; he contends that the evidence failed to establish NSV as "associationally or organizationally connected to any other Norteño group or larger organization."

We see no *Prunty* error. In *Prunty*, the jury had heard about multiple subsets of the Norteños and about which individuals were members of particular subsets. (See, e.g., *Prunty, supra*, 62 Cal.4th at p. 82, fn. 6.) Here, however, there was sufficient evidence to support a jury finding that all the relevant gang evidence concerned the same Visalia-based Norteño subset, the NSV gang. Fahoum testified that NSV is a "subset for a Norte[ñ]o gang" in Visalia. She also testified to the existence of other gangs, like Varrio Woodlake or West Side Tulare, but indicated that NSV members are "heavily saturated" in Visalia. Cardenas's arguments fail because the record contains no evidence to suggest that Cardenas belonged

to any Norteño subset other than NSV, nor any evidence to suggest that any other Norteño subset committed the predicate crimes. Cardenas argues that Fahoum identified certain gang members only as Norteños, not as NSV members, but he acknowledges that, when describing gang members operating in NSV territory, Fahoum "used the terms Norteño and NSV interchangeably." Given the absence of evidence or argument by the parties that an alternative subset could be responsible for the predicate crimes, a reasonable fact finder could conclude that the NSV subset was the single relevant criminal street gang for the purpose of evaluating the evidence in this case.

### c. *Specific Intent To Further Criminal Conduct by Gang Members*

Cardenas argues that there was insufficient evidence to show that he acted with the specific intent to further the criminal conduct of gang members, as both the gang enhancement statute and the special circumstance statute require. We are unpersuaded. A rational trier of fact could find beyond a reasonable doubt that, in committing the shooting, Cardenas specifically intended to further criminal activities of NSV members by enhancing control of the gang's area of operations and violently eliminating members of its "main rival" and "enemy" gang. The jury heard that the shooting took place on NSV territory, and Officer Fahoum explained that defending gang territory was an important goal for NSV. Just before the shooting, Cardenas concluded that his eventual victims were Sureños (members of the rival gang); he referred to them as "Scraps," a derogatory term for Sureños that NSV members typically used. The jury could also conclude that Cardenas etched "X4," a reference to NSV, on the trunk of Gerardo's car,

further signaling Cardenas's intent to promote NSV's criminal activities.

Cardenas argues that this evidence is insufficient under our decision in *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*), a pre-Assembly Bill 333 case concerning the sufficiency of the evidence to prove a gang enhancement in a case involving a lone actor alleged to have committed a crime to enhance the gang's reputation. According to Cardenas, neither Fahoum's testimony nor any other trial evidence showed the " 'significant connection' " between the current offense and other gang offenses that *Renteria* requires in lone-actor cases.[9] The argument is unpersuasive.

We explained in *Renteria* that lone-actor cases require a different showing of specific intent than cases where multiple gang members were involved in the charged offense. (*Renteria, supra*, 13 Cal.5th at pp. 964–965.) Whereas joint involvement in a crime by fellow gang members often provides circumstantial evidence of an intent to promote the criminal activity of other gang members, the showing of intent for a gang member who acted alone must include substantial evidence that the

---

[9] The Attorney General argues that this case is not a lone-actor case because Cardenas acted in concert with other NSV members including Luis Rebolledo, and that the guidance we gave in *Renteria* is therefore inapplicable. The Attorney General further argues that the lone-actor specific intent requirements announced in *Renteria*, which evaluated the gang enhancement, do not apply to the gang-murder special circumstance. We do not reach these arguments. Assuming, for the sake of argument, that *Renteria* does apply to the gang enhancement and gang-murder special-circumstance findings in this case, we conclude that the evidence of the gang findings was sufficient under the law as it existed at the time of trial.

defendant was aware of the type of criminal activity the gang members pursue and intended to promote criminal activity other than the charged offense. (*Id.* at pp. 965–966.) That showing can rely on expert testimony that the commission of a particular crime by gang members enhances the gang's reputation, but only if there is "evidence connecting [that] testimony . . . to the defendant's commission of a crime on a particular occasion for the benefit of the gang, and with the specific intent to promote criminal activities by the gang's members." (*Id.* at p. 969.) We identified several factors that could help establish such a connection: "whether the defendant's gang membership was apparent to observers, whether the victim was a gang member or rival of the defendant's gang, and whether retaliation for prior gang activity or disputes prompted the defendant's crime." (*Id.* at p. 968.) We found no sufficient connection in that case and vacated the gang enhancement. (*Id.* at p. 973.)

This case is distinguishable from *Renteria*. In *Renteria*, the defendant shot at two houses that had no confirmed association with a rival gang. (*Renteria, supra*, 13 Cal.5th at pp. 958–959, 971.) We thus explained that "[t]he first and most fundamental difficulty with the prosecution's case is that no substantial evidence shows that Renteria intended his actions to be attributed to his gang," nor did the evidence show that Renteria intended the shooting otherwise "to contribute to his gang's rivalry with [the rival gang]." (*Id.* at p. 971.) Here, by contrast, the trial evidence showed that Cardenas called the victims "Scraps" and showed great concern about confirming their rival gang membership, shot these rival gang members in retaliation for their presence on NSV territory, and etched what appeared to be an "X4" gang symbol on the murder victim's car.

34

The evidence of the shooting's circumstances "connect[ed] [Fahoum's] testimony about any general reputational advantage that might accrue to the gang because of its members' crimes to [Cardenas's] commission of [the shooting] for the benefit of the gang." (*Id.* at p. 969.)

Cardenas argues that there is an " 'analytical gap' " in Officer Fahoum's testimony because she did not identify other crimes that NSV committed in its territory and did not explain how increased control of that territory would help the commission of other crimes. (See *Renteria*, *supra*, 13 Cal.5th at pp. 965–966 [in lone actor cases, intent to promote, further, or assist "criminal conduct by gang *members . . .* necessarily means the promotion of conduct other than the commission of the underlying felony"], italics in original.) But, as noted, Fahoum did identify NSV's main criminal activities, including grand theft auto, carjacking, assault, murder, and attempted murder, and the jury could reasonably infer that NSV members commit some of these crimes within their territory. The jury could also reasonably infer that by killing perceived rival gang members in NSV territory and etching a gang symbol at the scene of the crime, Cardenas intended to send a message to the community about the gang's capacity for violence and control over its territory, and did so with an intent to promote the criminal activities of his gang. Given the other evidence presented, it was not necessary for Officer Fahoum to march through each of these analytical steps. Based on the evidence, the jury could reasonably infer that Cardenas acted with "knowledge of at least some of the criminal activities of the gang and its members and intent to further those activities." (*Id.* at p. 967.)

## 2. *Gang Enhancement: Intent To Benefit a Criminal Street Gang*

Cardenas argues that insufficient evidence supported the jury's finding that the shooting was committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22(b)(1).) This argument, too, lacks merit.

To help the jury evaluate this element, the prosecution presented Fahoum with a hypothetical asking her how it would benefit NSV for a known NSV member to shoot at people wearing blue in NSV territory. Fahoum responded that gangs strive to instill fear and that "the primary fight for all gang members is over turf." The shooting would thus benefit NSV because "it would show they are defending their territory" and "answering to the insult of Southerners coming into their territory." She stated that the NSV member in the hypothetical may also improve his stature in the gang by standing up for NSV turf. Talking to a hypothetical more closely matching the facts of the charged shooting, Fahoum opined that it would be unlikely that the shooting would reflect a personal dispute: "[I]n this particular hypothetical, it has everything to do with gangs, because there's derogatory slurs such as Scraps being shouted. . . . There's gang indicia. The victim is wearing blue. The victim writes Sur on his car. [¶] . . . [T]he suspect writes some gang terms on the vehicle."

In *People v. Albillar* (2010) 51 Cal.4th 47, 63, we found that an expert opinion along similar lines supported the jury's finding that the crimes were committed to benefit the gang. The expert in that case, discussing a hypothetical, asserted that three gang members who brutally raped a victim who knew some of them were gang members would enhance their individual status and benefit their gang's reputation by raising

the level of fear and intimidation in the community. (*Ibid.*) Cardenas tries to distinguish *Albillar* on the ground that he apparently acted alone and displayed fewer visible signs of gang membership than the defendants in that case. The argument overlooks the considerable evidence that the crime was directly related to an ongoing gang rivalry: that the shooting took place in NSV territory; that Cardenas identified his victims as rival "Scraps" before shooting them; and that Cardenas etched an "X4" gang symbol on Gerardo's car during the shooting. The evidence was sufficient to support a finding that Cardenas shot perceived rival gang members for the benefit of his gang.

### 3. Gang-Murder Special Circumstance: Active Participant in a Criminal Street Gang

Section 190.2(a)(22) requires that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of [Penal Code ]Section 186.22." At the outset, the parties dispute what the prosecution had to prove to demonstrate that Cardenas was an active participant in NSV at the time of the offense. Cardenas argues that "active participation" for purpose of the gang-murder special circumstance required proof of all three elements of the substantive offense of active participation in a criminal street gang, as the offense was defined in the then-effective version of subdivision (a) of Penal Code section 186.22: (1) that a defendant "actively participates in any criminal street gang"; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (Pen. Code, § 186.22, former

subd. (a).) [10] The Attorney General argues that because section 190.2(a)(22) does not mention section 186.22, subdivision (a), its reference to " 'active participant' " should bear its plain meaning. We agree with the Attorney General.

Cardenas's argument for incorporating the entirety of Penal Code section 186.22, subdivision (a) draws on *People v. Robles* (2000) 23 Cal.4th 1106, but *Robles* does not support his position. In *Robles*, we interpreted a different penalty provision that prohibited " 'an active participant in a criminal street gang, *as defined in subdivision (a) of Section 186.22,*' " from unlawfully carrying a loaded firearm in public. (*Robles*, at p. 1115, italics added.) Given its explicit reference to section 186.22, subdivision (a) — which does not define the term "active participant in a criminal street gang" — we found this language ambiguous and evaluated two potential meanings: The penalty provision incorporated every element of section 186.22, subdivision (a), or the penalty provision merely referenced the first element of 186.22, subdivision (a), that the defendant " 'actively participates in any criminal street gang.' " (*Robles*, at p. 1112; see *id.* at p. 1111.) Invoking the rule of lenity, we adopted the former interpretation. (*Id.* at p. 1115.)

*Robles* provides no guidance for our interpretation of section 190.2(a)(22). (See *Carr, supra*, 190 Cal.App.4th at p. 487.) Unlike the penalty provision at issue in *Robles*, section 190.2(a)(22) does not incorporate, or even refer to, Penal Code section 186.22, subdivision (a). Instead, it references only

---

[10] The first element of Penal Code section 186.22, subdivision (a) has since been amended to require that the defendant "actively participates in *a* criminal street gang." (Pen. Code, § 186.22, subd. (a), italics added.)

subdivision (f) of Penal Code section 186.22, which defines "criminal street gang." (§ 190.2(a)(22).) Nothing in its language suggests an intent to incorporate all elements of the substantive active participation offense defined in section 186.22, subdivision (a). In the absence of any such intent, we understand section 190.2(a)(22)'s reference to "active participant," based on the "usual and ordinary meaning" of that term, to mean "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castenada* (2000) 23 Cal.4th 743, 747 [interpreting the first element of the § 186.22, subd. (a) offense].)

We have no difficulty in concluding there was sufficient evidence to support the finding that Cardenas's involvement was more than nominal or passive. His active participation was evidenced by the charged shooting, his prior offenses, and his uncharged prior altercations as a juvenile. The evidence related to these incidents illustrated to the jury his membership in NSV, his quarrels with rival Sureño gang members, and his interest in defending NSV territory. The jury therefore had sufficient evidence to determine beyond a reasonable doubt that Cardenas had more than a nominal or passive relationship to NSV. There was thus sufficient evidence to support the jury's special circumstance finding under the law as it existed at the time of trial.

### D. Sixth Amendment Right of Autonomy Over the Defense

Cardenas argues that trial counsel violated his Sixth Amendment right of autonomy over the defense by conceding that Cardenas was responsible for the shooting, in violation of the rule of *McCoy*, *supra*, 584 U.S. 414. We cannot evaluate this claim based on the limited record now before us. Under the

circumstances of the case, we conclude that it is appropriate to allow the parties to litigate the relevant issues on remand.

In *McCoy*, which was decided several years after the trial in this case, the United States Supreme Court held that the Sixth Amendment forbids allowing defense counsel to concede a defendant's guilt "over the defendant's intransigent and unambiguous objection." (*McCoy*, *supra*, 584 U.S. at p. 420; *id.* at p. 426 ["counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission"].) The court explained that the defendant's Sixth Amendment right to " 'the Assistance of Counsel for his defence' " preserves to the counseled defendant a right to autonomy as to the fundamental objectives of the defense. (*McCoy*, at p. 421; see *id.* at p. 422.) "Trial management," the court explained, "is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.] Some decisions, however, are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id.* at p. 422.) "Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category." (*Ibid.*) As *McCoy* recognized, a concession strategy, particularly in a capital case, may sometimes be a reasonable tactical choice. (*Id.* at p. 428.) Counsel, however, has a duty to discuss trial strategy with the client, and may not choose a strategy of conceding guilt in the face of the client's express objections. (*Id.* at pp. 421, 423.) The decision whether to concede guilt of a crime — "even a lesser crime than the one the prosecution charged" — is, ultimately, a decision that belongs to the defendant, if the defendant chooses

to make it. (*People v. Bloom* (2022) 12 Cal.5th 1008, 1039 (*Bloom*).)

The United States Supreme Court distinguished its prior decision in *Florida v. Nixon* (2004) 543 U.S. 175 (*Nixon*), which held that there was no Sixth Amendment violation when the defendant had " 'never verbally approved or protested' " defense counsel's proposed concession of guilt and "complained about the admission of his guilt only after trial." (*McCoy*, *supra*, 584 U.S. at p. 424, quoting and citing *Nixon*, at pp. 181, 185.) The *McCoy* court explained that "[i]f a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." (*McCoy*, at p. 424.) "Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way." (*Ibid*.)

In *McCoy*, by contrast, the defendant insistently protested defense counsel's strategy. (*McCoy*, *supra*, 584 U.S. at pp. 418–420.) Throughout the proceedings, McCoy maintained that he did not kill the three victims, that he had an alibi as he was out of state at the time of the killings, and that corrupt police officers had killed the victims following a drug deal. (*Ibid*.) Conversely, his counsel determined that, in light of the "overwhelming" evidence tying him to the murders, the best strategy to avoid a death sentence was to concede his guilt to build credibility with the jury and appeal to the jury's mercy at the penalty phase. (*Id.* at p. 418.) When McCoy learned of his counsel's strategy two weeks before trial, he was " 'furious' " and told his counsel " 'not to make that concession' " of guilt. (*Id.* at pp. 418–419.) Two days before trial, McCoy sought to terminate his counsel's representation over the disagreement. (*Id.* at p. 419.) When defense counsel told the jury in opening statement that the

evidence did not leave any reasonable doubt as to McCoy's guilt, McCoy protested to the court that his counsel was " 'selling [him] out.' " (*Ibid.*) McCoy then testified in his own defense and asserted his alibi to support his innocence. (*Id.* at p. 420.) His counsel again conceded guilt in closing argument. (*Ibid.*) After the jury returned three death verdicts, McCoy secured new counsel and moved for a new trial, arguing that the trial court violated his constitutional rights by allowing his trial counsel to concede his guilt despite his objections. (*Ibid.*) In agreeing with McCoy, the United States Supreme Court emphasized that he had "insistently" maintained his innocence and "strenuously" opposed his counsel's proposed strategy "at every opportunity, before and during trial, both in conference with his lawyer and in open court." (*Id.* at pp. 424, 428.)

In this case, defense counsel pursued a concession strategy not unlike the strategy in *McCoy*: In hopes of persuading the jury to find Cardenas not guilty of the capital murder of Gerardo Cortez, counsel argued to the jury that Cardenas had committed the shooting but did so without premeditation, deliberation, or an intent to benefit the NSV gang. The central question before us concerns whether Cardenas raised a sufficiently clear, timely objection to invoke the rule of *McCoy*.

From the very start of the trial, defense counsel made clear that the defense strategy was to establish that Cardenas shot Gerardo without premeditation or deliberation, and thus was not guilty of first degree murder. She told the jury in her opening statement: "I think when the evidence reveals itself, that you will not be able to find proof beyond a reasonable doubt this was a first degree murder, but rather some other type of homicide." Defense counsel stated that in a prior confrontation, Gerardo had attacked Cardenas with a screwdriver. Noting the

"bad blood" between Gerardo and Cardenas and that a screwdriver was also found in Gerardo's clothing following his death, defense counsel asserted to the jury that the shooting was a "confrontation other than premeditated, deliberate murder, but rather self-defense, sudden quarrel."[11]  Defense counsel asserted that the evidence would further show that the shooting was "a personal endeavor, not for the benefit of any . . . gang," so the jury should not find the gang-murder special circumstance to be true.

As the Attorney General notes, and Cardenas does not dispute, there is no evidence that Cardenas objected to his attorney's admission of guilt at that time.  Instead, so far as the record reveals, Cardenas raised his first objection to his counsel's strategy in a *Marsden*[12] hearing nearing the end of trial, after the final defense witness testified and just before the defense rested.  Cardenas stated to the trial court, "[It] seems like we're going into this trial with a self-defense kind of plea and stuff, and that was something I never agreed to or anything like that."  He followed:  "But the thing is, you know what I

---

[11]    Although defense counsel referred to "self-defense" in her opening statement, she did not argue that Gerardo's killing was in perfect self-defense and thus a justifiable homicide because Cardenas actually and reasonably believed it was necessary to defend himself from an imminent danger of death or great bodily injury.  (See *People v. Thomas* (2023) 14 Cal.5th 327, 385–386, cert. den. *sub nom. Thomas v. California* (2023) __ U.S. __ [143 S.Ct. 2573, 216 L.Ed.2d 1188].)  At one point during trial, defense counsel asked to call two witnesses who could testify that Octavio used to carry weapons in order to support "a case of self-defense" but did not articulate the self-defense theory she had in mind.  The trial court refused to allow that testimony after noting that it had not "heard any evidence of self-defense."

[12]    *People v. Marsden* (1970) 2 Cal.3d 118.

mean, I'm trying to prove my innocence." The court then asked, "You were indicating that as you see the defense, they are talking about self-defense. You want the defense to be, in fact, you didn't do it at all?," to which Cardenas answered, "Yes." Cardenas explained that to support his alibi defense, he was seeking testimony from witnesses that could "clear [him] up" or "bring forth who actually did the crime." But he acknowledged that it had been difficult to secure such witnesses, noting that these individuals feared being charged for crimes in connection with the trial. When the court asked to confirm whether Cardenas was claiming his lawyer was doing "a bad job," Cardenas replied: "There's nothing wrong with my attorney. For the most part she's done her part and was getting ready to contact these people. The people are in fear of coming to court. They don't want to be prosecuted." "My attorney is not at fault or anything. I'm not blaming her or anything. I know for the most part, she's trying to contact everybody." The court then assured Cardenas that his counsel was "doing a very good job," and opined that "[t]here's no reason, of course and I think [Cardenas will] agree, for [the court] to relieve her at this time, but [his] concerns are on the record."

In closing argument, defense counsel again argued that while Cardenas committed the shooting, the shooting was not premeditated or deliberate, as would be required to convict Cardenas of first degree murder. She also reiterated that Cardenas's reasons for the shooting were related to "a personal problem" stemming from a previous altercation, suggesting that while Cardenas was responsible for shooting the victims, he did not do so for the benefit of his gang and so should not be found liable for special circumstance murder.

As with the opening statement, Cardenas did not object to these statements at the time. But in an undated letter the court received during the penalty phase, after the jury had returned its guilt phase verdicts, Cardenas wrote: "Would my rights to a fair trial be violated if my attorney threw out the trial from the beginning of open arguments to closing arguments telling the jury that I was guilty of a lesser crime without first securing my approval of this tactic? If so, how serious can this affect my rights to a fair trial? Then what would be the Court's duties and responsibility to correct or determine if such an act violated my rights to a fair and just trial?"

In response to Cardenas's letter, the court held a second *Marsden* hearing. During the second *Marsden* hearing, the court again assured Cardenas: "[The court's] duty is simply to determine whether your attorney is acting as a competent lawyer and representing your rights in a competent manner and [the court] [hasn't] seen anything that says that she hasn't done work[] other than [competently]." The court then confirmed that Cardenas wanted to object to his defense counsel "saying [during closing argument] convict my client of a lesser charge without getting [his] approval." The court added again that, in its view of the evidence, defense counsel chose appropriate trial tactics. Cardenas stated his trial counsel was "over here telling them I'm guilty" while "I'm telling her[] I'm innocent" and made the following objection: "[I]f she's informing the jury that I'm guilty of a charge which I'm trying to prove my innocence to[,] and she [is] continuing to tell them I'm guilty[,] and the prosecution [is] telling them I'm guilty[,] of course they are going to find me guilty of a crime. My thing is by her saying I'm guilty without her telling them I'm guilty or anything [—] me trying to prove my innocence[,] does that [violate] my constitutional right to [a

fair trial]?" The court disagreed with Cardenas, noting that it did not appear defense counsel "ever said [Cardenas] [was] guilty. . . . [S]he was saying that guilt has not been satisfactorily shown." The trial court also told Cardenas that defense counsel "doesn't necessarily have to conduct a defense exactly as you would like to."

Cardenas argues that his statements at the *Marsden* hearings were sufficient to invoke his Sixth Amendment right to determine the objectives of the defense under *McCoy*. In Cardenas's view, counsel erred in failing to alter the defense strategy after he raised his objections to conceding his guilt of a lesser offense. We are not, however, convinced that the statements at the *Marsden* hearings, standing alone, suffice. Certainly this case is not like *Nixon*, *supra*, 543 U.S. 175, in which the defendant appeared to have nothing at all to say about the defense's concession strategy until after the trial had concluded. But neither is it like *McCoy*, in which the defendant consistently insisted that he did not commit the charged murder and "opposed [his counsel's] assertion of his guilt at every opportunity." (*McCoy*, *supra*, 584 U.S. at p. 424.) Nor, for that matter, is it like *Bloom*, in which the defendant repeatedly made his objections known in his repeated efforts to relieve his counsel "[t]hroughout pretrial proceedings." (*Bloom*, *supra*, 12 Cal.5th at p. 1036.)

Here, even though counsel laid out her concession strategy in her opening statement to the jury, the record contains no indication that Cardenas objected at the time. When he did raise concerns at the first *Marsden* hearing, held just before the defense rested, the precise nature of his concerns was unclear. While Cardenas stated at that hearing that he wished to maintain his factual innocence by presenting alibi witnesses, he

also acknowledged that he and his counsel had encountered insurmountable difficulties in finding alibi witnesses available and willing to testify on his behalf. He did not state that he wished to pursue a strategy of arguing his actual innocence even if no alibi witnesses could be found to support the argument. He also made clear that he did not find fault with his attorney's performance — even though, as noted, his attorney had already conceded his responsibility for the shootings in her opening statement to the jury. As far as the record before us reveals, Cardenas's primary concern at the first *Marsden* hearing appeared to be with locating available witnesses who could support an alibi defense. Despite his expressed desire to maintain his innocence, it is unclear that he wished to prevent counsel from repeating the concessions she had already made in her opening statement as an alternative strategy if the necessary alibi witnesses could not be located, as it appeared they could not. (Cf. *Bloom*, *supra*, 12 Cal.5th at p. 1040 [finding a *McCoy* violation where defendant informed "the court and counsel, in unmistakable terms, that he did not want to admit to killing" the victims].)

Cardenas's frustration with counsel's strategy became somewhat clearer at the second *Marsden* hearing. At that hearing, Cardenas did explain his desire to prove his innocence and expressed disapproval at his counsel's suggestion that he "was guilty of a lesser crime without first securing [Cardenas's] approval of this tactic." But the record still leaves some ambiguity. It is unclear whether Cardenas's complaint was that counsel pursued the concession strategy over his *objection*, or that counsel pursued the concession strategy without his *explicit consent*. The distinction matters under *McCoy*, which reaffirmed that there is " '[no] blanket rule' " that " 'demand[s]

the defendant's explicit consent' " to a concession strategy. (*McCoy*, *supra*, 584 U.S. at p. 417, quoting *Nixon*, *supra*, 543 U.S. at p. 192.)

But more to the point, however, even assuming the second *Marsden* hearing should have put counsel and the court on notice that Cardenas did not want to concede guilt of any lesser offense, that notice would have come too late, since the jury had already returned its guilty verdicts. (Cf. *McCoy*, *supra*, 584 U.S. at p. 424 [distinguishing *Nixon* on the ground that "Nixon complained about the admission of his guilt only after trial"].) At that point, there was nothing defense counsel could have done to "steer the ship" in a different direction. (*Id.* at p. 424.)

In short, the record, as it stands, raises a substantial possibility that Cardenas wished to maintain his innocence of the shooting, regardless of what witnesses could or could not be found to support his preferred alternative alibi defense, but the record does not reflect whether he made those wishes known to counsel in a timely way. (See *People v. Eddy* (2019) 33 Cal.App.5th 472, 481–483 [finding *McCoy* error where *Marsden* hearing revealed evidence that defendant unequivocally objected to counsel's concession strategy out of court, before counsel's decision to concede guilt in closing argument].) So far as the record reveals, it is also possible that Cardenas was willing to go along with the concession strategy, at least up until the time it became clear from the jury's guilty verdicts that the strategy had not worked. Because the record here was made substantially before *McCoy*, neither the court nor the parties made the appropriate inquiries necessary for us to fully evaluate the issue. Had the hearings been conducted with the benefit of *McCoy*, it would have been clear that the decision to concede guilt rested with the client, and the trial court would

presumably have conducted a more focused inquiry on the nature of Cardenas's objections, when those objections arose, and when Cardenas first made counsel aware of his opposition to counsel's strategy.

To enable further factual exploration and overcome the limitations in the record of the *Marsden* hearings, we conclude that it is appropriate to allow Cardenas to further develop his *McCoy* claim on remand.  Our case law is clear that, as a general rule, habeas is the appropriate vehicle for exploring factual questions related to attorney performance.  (See *People v. Lopez* (2008) 42 Cal.4th 960, 966, 972; *People v. Mai* (2013) 57 Cal.4th 986, 1009.)  But in certain limited circumstances, we have previously ordered limited remands for purposes of developing the record necessary to evaluate a claim raised on appeal. (*People v. Lightsey* (2012) 54 Cal.4th 668, 706–707; *People v. Johnson* (2006) 38 Cal.4th 1096, 1098.)  Here, given the unique circumstances of this case and its procedural posture, we conclude the situation is sufficiently exceptional to warrant deviation from the general rule.  In particular, as noted, the parties were deprived of the opportunity to create a more complete record with the benefit of *McCoy*'s guidance. Furthermore, for reasons already explained, this matter must be remanded for further proceedings in any event.  In this unique situation, we will order a limited remand on Cardenas's *McCoy* claim as well.

### E.  Cumulative Prejudice

Cardenas argues that cumulative guilt phase errors require reversal of not only his gang enhancements and gang-murder special circumstance but also his murder and attempted murder convictions.  Cardenas argues that three errors require

reversal of his convictions:  the trial court's denial of Cardenas's motion to recuse the Tulare County District Attorney's Office without holding an evidentiary hearing; the court's refusal to bifurcate the gang allegations; and his counsel's admission of guilt despite his desire to maintain his innocence, in violation of the Sixth Amendment rule articulated in *McCoy*.  Having found no error on the first two claims, we find no error to cumulate. (*People v. Beames* (2007) 40 Cal.4th 907, 933.)  As noted, Cardenas may continue to pursue the third claim on remand. His claim of cumulative error, however, fails.

### F.  Other Claims under Recent Legislation

Cardenas has signaled that he intends to raise additional claims made available by recently enacted legislation:  Senate Bill No. 620 (2017–2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2), which amended Penal Code section 12022.53 to give trial courts discretion to strike a firearm enhancement imposed under that section (Pen. Code, § 12022.53, subd. (h)), and the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 3.5), which "prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin" (*People v. Wilson* (2024) 16 Cal.5th 874, 945).  The Attorney General agrees that these claims may be raised in superior court on remand.  We do not further address those matters here.

### IV.  DISPOSITION

We reverse the judgments of conviction and the judgment of death, and remand to the trial court for further proceedings in accordance with this opinion.

On remand, the parties may conduct additional proceedings as appropriate to the resolution of Cardenas's claim

under *McCoy v. Louisiana*, *supra*, 584 U.S. 414, and any claims Cardenas may raise under Senate Bill No. 620 (2017–2018 Reg. Sess.) and the California Racial Justice Act of 2020. If the trial court finds *McCoy* or Racial Justice Act error requiring reversal of the judgments of conviction, it must set the case for a new trial. (See *People v. Lightsey*, *supra*, 54 Cal.4th at p. 733; *People v. Johnson*, *supra*, 38 Cal.4th at pp. 1103–1104.) Otherwise, the trial court must reinstate the judgments of conviction. If the judgments of conviction are reinstated, and unless barred following adjudication of any additional claims Cardenas may raise on remand, the People may retry the gang allegations, including the gang-murder special-circumstance allegation, if they so choose. (See *People v. Cooper* (2023) 14 Cal.5th 735, 746–747.) If the People retry the gang-murder special-circumstance allegation and the allegation is found true, the People may retry the penalty phase.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**   People v. Cardenas

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S151493
**Date Filed:** September 4, 2025

_____

**Court:** Superior
**County:** Tulare
**Judge:** Patrick J. O'Hara

_____

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Jessica K. McGuire, Assistant State Public Defender, Karen Hamilton, Hassan Gorguinpour and Gary Johnston, Deputy State Public Defenders, for Defendant and Appellant.

O'Melveny & Myers, Chris A. Hollinger, Anna T. Pletcher, Megan Havstad; and Nathalia Varela for LatinoJustice PRLDEF as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell and James William Bilderback II, Assistant Attorneys General, Kenneth N. Sokoler, Daniel B. Bernstein, Sean M. McCoy, Tia M. Coronado and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Hassan Gorguinpour
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA 95814
(916) 322-2676

Ross K. Naughton
Deputy Attorney General
1300 I Street, 14th Floor
Sacramento, CA 95814
(916) 210-6283